

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-2000

# C.H. v. Oliva

Precedential or Non-Precedential:

Docket 98-5061

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

## Recommended Citation

"C.H. v. Oliva" (2000). *2000 Decisions.* Paper 177.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/177

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 28, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5061

C.H., AS GUARDIAN AD LITEM OF Z.H., A MINOR,
AND C.H., INDIVIDUALLY
Appellant

v.

GRACE OLIVA; GAIL PRATT; PATRICK JOHNSON;
MEDFORD TOWNSHIP BOARD OF EDUCATION;
LEO KLAGHOLTZ, Commissioner of Education;
THE STATE OF NEW JERSEY
DEPARTMENT OF EDUCATION

Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil No. 96-cv-02768)
District Judge: Honorable Joseph H. Rodriguez

Argued June 2, 1999

BEFORE: STAPLETON and ROTH, Circuit Judges, and
LONGOBARDI,* District Judge

Reargued En Banc February 16, 2000

BEFORE: BECKER, Chief Judge, SLOVITER, MANSMANN,
GREENBERG, SCIRICA, NYGAARD, ALITO, ROTH,
MCKEE, RENDELL, BARRY and STAPLETON,
Circuit Judges

(Opinion filed: August 28, 2000)
_____

* Honorable Joseph J. Longobardi, Senior United States District Judge
for the District of Delaware, sitting by designation.

F. Michael Daily, Jr.
Quinlan, Dunne & Daily
16 North Centre Street
Merchantville, NJ 08109-2519
 and
Eric W. Treene
Kevin J. Hasson (Argued)
The Becket Fund for Religious
 Liberty
2000 Pennsylvania Avenue, N.W.
Suite 3200
Washington, DC 20006
 Attorneys for Appellant

Betsy G. Liebman
Capehart & Scatchard
8000 Midlantic Drive
Laurel Corporate Center, Suite 300
Mount Laurel, NJ 08054
 and
Michael P. Madden (Argued)
Madden, Madden & Del Duca
108 Kings Highway East, Suite 200
P.O. Box 210
Haddonfield, NJ 08033
 and
John K. Worthington (Argued)
Office of Attorney General of
 New Jersey
Richard J. Hughes Justice Complex
Trenton, NJ 08625
 Attorneys for Appellees

Marc D. Stern
American Jewish Congress
15 East 84th Street
New York, NY 10028
 Attorney for Amicus-Appellee
American Jewish Congress

2

OPINION OF THE COURT

STAPLETON, Circuit Judge:

C.H., as guardian ad litem of Z.H., appeals from an order
of the District Court dismissing her complaint in this civil
rights action. The complaint alleges that the First
Amendment rights of Z.H., a minor, were violated on two
occasions: once when he was a kindergarten student and
once when he was in the first grade.[1] The District Court
held, inter alia, that it had no jurisdiction over the
defendant Department of Education of the State of New
Jersey and that no constitutional violation occurred on
either occasion. It entered judgment on the pleadings in
favor of all of the defendants.

This en banc court finds itself equally divided on the
issue of whether judgment was properly entered in favor of
the defendants other than the Department of Education on
the First Amendment claim arising from the first grade
episode. Accordingly, we will affirm the District Court's
judgments in favor of those defendants on that basis
without further explication. While we agree with the District
Court that the Department of Education is immune from
suit in a federal court under the Eleventh Amendment, we
will vacate the judgment in its favor and remand with
instructions to dismiss the claims against it for lack of
jurisdiction. With respect to the other defendants, we
conclude that the complaint fails to state claims against
them arising out of the kindergarten episode. We will
remand, however, to give C.H. an opportunity to cure the
deficiencies we have identified if she is able to do so.

I.

The following facts are affirmatively alleged in the

_____

1. The complaint purports to state claims under both the Free Speech
Clause and the Establishment Clause of the First Amendment. Given our
resolution of this appeal, it is unnecessary for us to distinguish in this
opinion between the two theories of liability.

complaint. In the Fall of 1994, Z.H. was a kindergarten student at the Haines Elementary School, a public school, in Medford, New Jersey. Defendant Pratt was the principal of that school; defendant Johnson was the Superintendent of Schools in the Medford School District; and defendant Medford Township Board of Education owned and operated the public schools in the District. Defendant Klagholtz was the Commissioner of Education of the State of New Jersey. He and defendant Department of Education of the State of New Jersey are alleged to be responsible for the general supervision of public education in the State. Defendant Oliva was to be Z.H.'s first grade teacher in the following year and was not involved in the relevant events in 1994.

In the spirit of the Thanksgiving holiday, Z.H.'s teacher asked the students to make posters depicting what they were "thankful for." Z.H. produced a poster indicating that he was thankful for Jesus. The allegations with respect to the remainder of the kindergarten episode are as follows:

> 13. Z.H.'s poster along with those of his classmates were subsequently placed on display in the hallway of the school. Subsequently, employees of Defendant, Township of Medford Board of Education, removed Z.H.'s poster because of its religious theme.

> 14. Said removal occurred on a day when Z.H.'s kindergarten teacher was absent. Upon her return, said teacher properly returned the poster to the hallway, although this time the poster was placed at a less prominent location at the end of said hallway.

> 15. Both Z.H. and C.H. were made aware of the removal of the poster because of its religious theme.

The removal is thus twice alleged to have been motivated by the religious theme of the poster, but that removal is alleged to have been done by unidentified "employees of Defendant." On the other hand, the restoration to a "less prominent location" is attributed to Z.H.'s teacher who is not joined as a defendant and who is not alleged to have acted because of the poster's religious theme. None of the defendants in the case is alleged to have participated in, or been aware of, the decision to remove the poster or to restore it to a "less prominent location."

4

II.

The Department of Education is a state agency and as such is immune from suit in a federal court without regard to the nature of the relief sought. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-101 (1984). Accordingly, we agree with the District Court that this suit could not go forward against the Department of Education. Having concluded that it was immune from suit under the Eleventh Amendment, however, it should have dismissed the claim against the Department for want of jurisdiction, rather than entering judgment in its favor. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 63 (1996); Wheeling & Erie Ry. Co. v. Public Utility Comm'n, 141 F.3d 88, 91 n.3 (3d Cir. 1998); Sullivan v. Barnett, 139 F.3d 158, 179 (3d Cir. 1998).

III.

It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Township, 50 F.3d 1186, 1190 (3d Cir. 1995). There is no vicarious, respondeat superior liability under S 1983. See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Hopp v. City of Pittsburgh, 194 F.3d 434, 441 (3d Cir. 1999). Moreover, a school board can be held responsible for a constitutional violation of a teacher only if the violation occurred as a result of a policy, custom or practice established or approved by the board. See Monell, 436 U.S. at 694; Woodwind Estates, Ltd. v. Gretkowski, No. 99-3280, 2000 WL 223590, at *7 (3d Cir. 2000); Hopp, 194 F.3d at 441.

As we have noted, there is no allegation that Oliva, Pratt, Johnson or the Board of Education participated in or approved the removal or restoration decisions and the Board of Education is not alleged to have established or approved any policy, custom or practice. Similarly, it is not alleged that the State Commissioner established or approved a policy, practice or custom causally related to

5

the removal or restoration decisions. Rather the allegation as to the Commissioner is that he "failed to exercise [his] supervisory powers in a fashion which would protect the constitutional rights of students such as Z.H." (A. 11).

As the District Court recognized, a state official who is acting in violation of the United States Constitution can be sued for prospective equitable relief. See Ex parte Young, 209 U.S. 123 (1908). A state official may be held responsible under S 1983 for exercising or failing to exercise supervisory authority, however, only if that official "has exhibited deliberate indifference to the plight of the person deprived." Sample v. Diedes, 885 F.2d 1099, 1118 (3d Cir. 1989). Accordingly, a plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendant failed to employ, he or she must also allege "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997) (quoting Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988). Here the sole allegation against the Commissioner is that he failed to supervise in a way that would have prevented the alleged violation of Z.H.'s First Amendment rights. That is insufficient.

IV.

This is not a situation in which the complaint is merely lacking in factual detail. It is a situation in which the fair inference from the facts alleged is that the defendants did not play any role in the challenged decisions and there is no allegation, even conclusory, to the contrary. Accordingly, this is a situation in which it is very likely that the Court is being asked to resolve an important issue of constitutional law that is a purely hypothetical one as far as these parties are concerned.

While the removal is alleged to have been motivated by the religious theme of the poster, it is not alleged that the removal occurred as a result of any school policy against

6

the exhibition of religious material. To the contrary, the affirmatively alleged prompt return of the poster to the display vouches for the absence of such a policy. Also noticeably absent from the complaint is any allegation that the restoration to "a less prominent place" was the result of a school policy or an authoritative directive from Principal Pratt or Superintendent Johnson. To the contrary, C.H.'s brief before the District Court indicates that there was no such policy or directive and that the placement was the product of an ad hoc "compromise" among peers. The brief explains C.H.'s understanding that Z.H.'s "kindergarten teacher on her own initiative returned the poster to public display, but . . . as a compromise to those who were against any display of the poster, agreed to place it in a less prominent position." Plaintiff 's Brief in Opposition at 1 n.2.

We decline to address the tendered constitutional issue under these circumstances. On the other hand, we acknowledge that the absence of allegations of participation was not pressed in support of the defendants' motion for judgment on the pleadings and that, if it had been, C.H. would undoubtedly have been given an opportunity to amend her complaint. Moreover, we cannot rule out the possibility that C.H. might be able to establish through amendment that an actual case or controversy exists between the parties. Under these circumstances, we conclude that the prudent course is to remand this case to the District Court with instructions to provide C.H. with an opportunity to amend. If she is unable to allege personal involvement in the kindergarten episode on the part of any of the defendants, the complaint should be dismissed. If personal involvement is alleged, the District Court should conduct further proceedings consistent with this opinion.

We will vacate the judgment of the District Court entered in favor of the Department of Education and will remand with instructions to dismiss the complaint against it for want of jurisdiction. We will affirm the judgment of the District Court with respect to the claims against the remaining defendants arising from the events occurring during Z.H.'s first grade year. We will vacate the judgment of the District Court with respect to the remaining claims and will remand with instructions to provide C.H. an

7

opportunity to amend the allegations of her complaint concerning them.

8

ALITO, Circuit Judge, with whom MANSMANN, Circuit
Judge, joins, dissenting:

In accordance with tradition, I will not comment on the
decision of the en banc court insofar as it affirms, by an
equally divided vote, the judgment of the District Court
regarding Zachary Hood's[1] wish to read the story, "A Big
Family," to his class. I must write, however, regarding the
full court's decision with respect to Zachary's Thanksgiving
poster. Instead of confronting the First Amendment issue
that is squarely presented by that incident, the court ducks
the issue and bases its decision on a spurious procedural
ground never raised by the defendants--viz., that the
complaint does not adequately allege facts providing a basis
for holding any of the defendants responsible for the
treatment of the poster. I dissent.

I.

The incident concerning the Thanksgiving poster
occurred when Zachary was in kindergarten at the Haines
Elementary School in Medford, New Jersey. As alleged in
the complaint, this is what happened. With Thanksgiving
approaching, Zachary's teacher told the students to make
posters depicting what they were "thankful for." Zachary
drew a picture of Jesus. All of the pupils' posters, including
Zachary's, were initially hung in the hallway of the school,
but on a day when Zachary's teacher was absent, unnamed
employees of the school board removed the poster"because
of its religious theme." The next day, Zachary's teacher put
the picture back on the wall -- but this time in a less
prominent spot at the end of the hall.

The following year another, similar incident occurred
while Zachary was in Grace Oliva's first-grade class at the
same school. As a reward for achieving a certain degree of
proficiency in reading, Ms. Oliva invited students to bring
in a book to read to the class. "The only condition on the
selection was that it would be reviewed first by[Ms. Oliva]
_____

1. Although the complaint identified Zachary and his mother, Carol
Hood, by initials, rather than by name, their names are used in the
plaintiff 's most recent brief, and I therefore use them in this opinion.

9

to insure that its length [and] complexity were appropriate for the first grade." Zachary qualified to read a story to the class and brought to school a book entitled The Beginner's Bible: Timeless Children's Stories. Zachary wanted to read the following story, called "A Big Family," which represents an adaptation of the story of the reconciliation of Jacob and Esau from Genesis 29:1-33:20:

> Jacob traveled far away to his uncle's house. He worked for his uncle taking care of sheep. While he was there, Jacob got married. He had twelve sons. Jacob's big family lived on his uncle's land for many years. But Jacob wanted to go back home. One day, Jacob packed up all his animals and his family and everything he had. They traveled all the way back home to where Esau lived. Now Jacob was afraid that Esau might still be angry at him. So he sent presents to Esau. He sent servants who said, "Please don't be angry anymore." But Esau wasn't angry. He ran to Jacob. He hugged and kissed him. He was happy to see his brother again.

Ms. Oliva told Zachary that he could not read this story to the class "because of its religious content." Instead, she permitted Zachary to read the story to her in private. Other students, however, were allowed to read their favorite stories to the class.

Upon learning of this incident, Zachary's mother, Carol Hood, spoke with Ms. Oliva, who informed her that Zachary could not read the story to the class "because it might influence other students." Ms. Hood next spoke with Gail Pratt, the school principal, who said that reading the story "was the equivalent of `praying'." Noting that she had received complaints in the past, Ms. Pratt stated that the story "might upset Muslim, Hindu or Jewish students." She added that there was "no place in the public school for the reading of the Bible" and advised: " `[M]aybe you should consider taking your child out of public school, since you don't appear to be public school material.' " Ms. Pratt noted that "her position was fully supported by various legal authorities." Ms. Hood made an appointment to speak again with Zachary's teacher, but she did not appear. Ms. Hood's lawyer then contacted Patrick Johnson, the school

10

superintendent, and demanded that Zachary be allowed to read the story to the class and that Ms. Pratt apologize for her conduct. The superintendent did not respond.

Ms. Hood, in her individual capacity and as Zachary's guardian ad litem, filed a two-count complaint in federal district court. Count I alleged that Ms. Oliva, Ms. Pratt, Mr. Johnson, and the Medford Board of Education (hereinafter collectively "the Medford defendants") had violated Zachary's constitutional right to freedom of expression. Count II alleged that the New Jersey Commissioner of Education and the New Jersey Department of Education had aided in this violation. Count II sought an order requiring the state to implement policies to protect students who wish to engage in the expression of religious views.

The defendants moved for judgment on the pleadings. In light of the putative pleading defect on which the full court now relies in relation to the poster incident, it is important to note the basis for the Medford defendants' motion. The Medford defendants did not argue that there were any formal defects in the complaint, and they certainly did not suggest that the claim concerning the poster should be dismissed because it did not state a basis for holding them responsible for the treatment of the poster. On the contrary, the Medford defendants acknowledged that judgment on the pleadings would be proper only if "the plaintiff could prove no set of facts which would entitle [her] to relief." Brief in Support of Rule 12(c) Motion for Judgment on Pleadings on Behalf of Defendants Medford Township Board of Education, Grace Oliva, Gail Pratt and Patrick Johnson. They also acknowledged, for purposes of the motion, that they were responsible for the removal and replacement of the poster, and they argued that their conduct was fully justified. They stated:

> For purposes of the instant motion only, defendants do not dispute plaintiff 's contention that the temporary removal and subsequent relocation of plaintiff 's poster was related to the poster's religious theme.

Id. at 19. They continued:

> [D]efendants merely relocated the poster to another location in the same hallway. Plaintiff cannot

11

reasonably contend that defendants inhibited religion by temporarily removing the poster and subsequently relocating it to another location in the same hallway.

Id. at 20 (emphasis added). In their reply brief in support of their motion, the Medford defendants stated:

[T]he Medford Defendants' temporary removal and almost immediate return of the poster to the hallway wall supports the inescapable conclusion that no such hostility existed.

Medford Defendant's 12(c) Reply Br. at 5 (emphasis added).

In granting the defendants' motion for judgment on the pleadings, the District Court did not rely upon-- or even note -- any formal defect in the complaint. On the contrary, like the Medford defendants themselves, the District Court accepted the fact that the Medford defendants were responsible for the removal of the poster and its relocation to a less conspicuous spot. The District Court stated:

The Medford defendants concede that the poster was removed and relocated because it had a religious theme.

C.H. v. Oliva, 990 F. Supp. 341, 354 (D.N.J. 1997). However, the Court held that the Medford defendants did not violate Zachary's right to freedom of expression because "relocating the poster of Jesus . . . [was] reasonably related to legitimate pedagogical concerns." Id. at 353.

On appeal, the Medford defendants took the same approach that they had in the District Court. They did not assert that there were any formal defects in the complaint, and they did not dispute, for purposes of the appeal, that they were responsible for the treatment of the poster. Rather, they argued that their removal and relocation of the poster were constitutional. The thrust of their argument was as follows:

The educators of Z.H.'s school were correctly concerned about the impact of the prominent display of Z.H.'s poster upon their young students. Students of a non-Christian faith may have felt that the prominent display of the poster constituted a comment by the

12

school on the correctness of Christianity or an endorsement of the Christian religion. These children may also have felt the prominent display of the poster to be a negative comment on their own religious beliefs. The Medford defendants should not be liable . . . for their concerns about the impact of Z.H.'s poster on his fellow classmates.

Medford Appellees' Br. at 14.

Both of the opinions issued by the panel before rehearing en banc was granted affirmed the District Court on the merits; neither was based upon -- or even hinted at -- any formal defects in the complaint. The first opinion was unpublished and disposed of the claims relating to "A Big Family" and the poster in less than two full typewritten pages. After the plaintiffs petitioned for rehearing en banc, the panel granted rehearing and issued a for-publication opinion. C.H. v. Oliva, 195 F.3d 167 (3d Cir. 1999). Like the Medford defendants' brief, this opinion did not dispute that the Medford defendants were responsible for the removal and relocation of the poster to a less prominent spot. The opinion stated that "the issue to be resolved is whether the school's decision to temporarily remove Z.H.'s poster was reasonably related to a legitimate pedagogical concern." Id. at 175. In striking contrast with the position taken in the opinion of the en banc court, the panel opinion never disputed that the Medford defendants were responsible for the treatment of the poster. Indeed, the for-publication panel opinion deferred to the professional judgment of the school officials that the temporary removal of the poster was appropriate for pedagogical reasons! The panel wrote:

Given the sensitivity of the issues raised by student religious expression, coupled with the notable immaturity of the students involved and the relatively public display of the posters in the school hallway, the school's temporary removal of the poster does not violate the First Amendment rights of the student artist. As we have indicated, decisions on issues of this kind necessarily involve fact-sensitive exercises of discretion by school authorities and reservation of a brief period for deliberation is thus a measure reasonably related to legitimate pedagogical concerns.

13

Id. (emphasis added). Plainly, the panel could not have deferred to the professional judgment of the school authorities if, as the full court now believes, the complaint does not even allege that those officials had any role in the poster's removal.

The for-publication panel opinion took a similar approach with respect to the relocation of the poster to a less prominent spot. The panel observed: "We decline plaintiff 's invitation to require the District Court to review and regulate the school's placement of its students' artwork." Id. at 176 n.3 (emphasis added).

Following the issuance of this panel decision, the court granted rehearing en banc and permitted the parties to submit supplemental briefs. Once again, the Medford defendants did not contend that the District Court's decision regarding the poster should be affirmed on the ground that the complaint did not adequately allege that they were responsible for the poster's treatment. On the contrary, they defended the treatment of the poster on the merits, arguing as follows:

> Z.H. did not have any particular right to have his poster displayed in a prominent location and a prominent display of the poster may have the impermissible effect of conveying a message of endorsement of Christianity. The Medford Defendant's (sic) actions were thus reasonably related to legitimate pedagogical concerns, namely the concern that their young charges might have construed . . . the prominent display of Z.H.'s poster as the school's approval of Z.H.'s religion.

Medford Appellees' Supplemental Br. at 9.

The en banc court heard extensive oral argument. Not one word was mentioned about the supposed failure of the complaint to plead in sufficient detail the basis for holding the Medford defendants liable for the removal and relocation of the poster.

Despite all this, the full court sua sponte raises the issue of the adequacy of the complaint and, without even permitting the plaintiff to comment on this new issue, the

14

court declines to reach the merits of the appeal and instead remands the case so that the plaintiff can seek to amend the complaint.

II.

A. Under the liberal pleading regime of the Federal Rules of Civil Procedure, the existing complaint is adequate. Under Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and under Fed. R. Civ. P. 8(f), "[a]ll pleadings shall be construed as to do substantial justice." A complaint must only give "fair notice of what the plaintiff 's claim is and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47 (1957). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46; see also Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).2

> [P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance as to what was decided for purposes of res judicata, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this.

5 C. Wright & A. Miller, Federal Practice and Procedure S 1202 at 69-70(1969)(footnote omitted).

Under these standards, the complaint in this case adequately avers a basis for holding the Medford defendants responsible for the treatment of the poster, i.e., its temporary removal and subsequent relocation to a less conspicuous place in the hall. While I think that the complaint adequately asserts a claim against all of the Medford defendants, I will focus on one defendant, Gail Pratt, the school principal. I do this because the sufficiency

---

2. This same principle governs a motion under Rule 12(c). 5A C. Wright & A. Miller, Federal Practice and ProcedureS 1368 at 494-95 & n.34 (2000 Supp.)(citing cases).

of the complaint with respect to her is clear and because, if that is so, the court must confront the merits of the plaintiff 's First Amendment claim whether or not the allegations pertaining to the other defendants are also adequate.

The complaint in this case alleges that "employees of Defendant, Township of Medford Board of Education, removed [Zachary's] poster because of its religious theme" on a day when Zachary's regular teacher was not present. The complaint also alleges that the next day Zachary's teacher put the poster back up on the wall, but in a less conspicuous spot at the end of the hall. Furthermore, the complaint avers facts from which it may be reasonably inferred that Pratt had received complaints about religious expression in the school (see Complaint para. 21), had consulted "legal authorities" regarding the issue (id.), and had developed a "position" that was not receptive to such expression. Id. (" `[M]aybe you[Carol Hood] should consider taking your child out of public school, since you don't appear to be public school material.' "). In view of these allegations, it cannot be said "beyond doubt that the plaintiff can prove no set of facts in support of h[er] claim which would entitle h[er] to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Pratt could be held responsible if she directed that the poster be treated as it was or if they knew about and acquiesced in the treatment. See, e.g. , Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Twp, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Pratt is portrayed in the complaint as a person with a strong and well-developed "position" about religious expression in her school. A poster of Jesus was put up in the hall of her elementary school by one of the teachers under her supervision. On a day when this teacher was away, the poster was taken down because of its religious content by unidentified school board employees. Then the next day, the regular teacher, having regained possession of the poster, put it back on the wall, but in a less noticeable spot than the one she had initially selected. Under modern pleading rules, these allegations are surely sufficient to assert a claim that Pratt knew about and acquiesced in

16

these sensitive events that went on over a period of days in her own school and that most likely occasioned discussion and, perhaps, controversy. Pratt's papers in the District Court and on appeal make it clear that she well understood the claim that was asserted against her, and for purposes of her motion for judgment on the pleadings, she did not dispute her involvement. Thus, the complaint adequately asserted a claim against her.

B. But even if it did not, why should our court sitting en banc reach this pleading issue? The defendants did not move to dismiss the complaint based on a pleading defect. The District Court did not dismiss the complaint on such a ground. The defendants did not raise any pleading issue on appeal. "We do not generally consider issues not raised by the parties," Bolden v. Southeastern Pennsylvania Transp. Auth., 953 F.2d 807, 812 (3d Cir. 1991) (en banc), and there is no good reason for us to raise a pleading issue sua sponte in this case. The only result of the court's approach is likely to be delay, expense for the parties, and a waste of judicial resources.

On remand, the plaintiff will be able to cure the putative defect in the complaint simply by alleging that Pratt knew about and acquiesced in the treatment of the poster and by specifying that this allegation is "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. Proc. 11(b)(4). Based solely on the facts already recited in the complaint, such an allegation would unquestionably be proper.

If the plaintiff amends the complaint by adding such an allegation, the District Court will have no basis for dismissing the complaint on a pleading ground, and thus the District Court will be required once again to decide whether the complaint states a valid First Amendment claim. The District Court has already ruled on this question, and since our Court's disposition of the current appeal provides no new guidance, the District Court will presumably adhere to its prior reasoning. The plaintiff will then be able to appeal, and the precise issue that the full court now avoids will be back. I see no reason for this wasteful procedure.

17

The Court justifies its approach as follows. According to the Court, "[t]his is not a situation in which the complaint is merely lacking in factual detail." Maj. Op. at 6. "It is a situation in which the fair inference from the facts alleged is that the defendants did not play any role in the challenged decisions and there is no allegation, even conclusory, to the contrary." Id. Apparently it is the Court's belief that, on remand, the plaintiff will "very likely" be unwilling to allege that Pratt knew about and acquiesced in the treatment of the poster and that the claim regarding the poster will be dismissed. This is what I understand the Court to mean when it writes that "it is very likely that the Court is being asked to resolve an important issue of constitutional law that is a purely hypothetical one as far as these parties are concerned." Id. Ifind the Court's discussion baffling.

As previously noted, if the plaintiff and her attorneys know no more about the treatment of the poster than is already alleged in the complaint, they have a more than adequate basis for adding the allegation needed to satisfy the Court's concern. The Court seems to think, however, that Pratt in fact did not know about and acquiesce in the treatment of the poster, that the plaintiff and/or her attorneys know this, and that they will accordingly be unwilling to allege that Pratt was involved.

Nothing in the record supports the Court's apparent belief, and there is much that points in the other direction. As noted, Pratt has not claimed that she lacked responsibility for the treatment of the poster. Moreover, since the plaintiff 's attorneys are presumably familiar with the legal standard for holding Pratt responsible, and since they have vigorously litigated the claim against her in the District Court and on appeal, they presumably are not aware of facts showing that Pratt had no involvement in the incident.

In support of its curious view, the Court cites a footnote in a brief submitted by the plaintiff to the District Court. The footnote states in pertinent part:

 Although not specifically stated in the pleadings, Plaintiffs will be prepared to show, if this matter

18

proceeds to trial, that the kindergarten teacher was of the view that the poster in question was an extremely appropriate response to the assignment, that in part because of how well the poster had been done, it was given a prominent location next to the door of the kindergarten room, and that the kindergarten teacher on her own initiative returned the poster to public display, but that as a compromise to those who were against any display of the poster, agreed to place it in a less prominent position.

Plaintiff 's Brief in Opposition to Rule 12(c) Motion at 1 n.2 (emphasis added).

Nothing in this passage suggests that the plaintiff will be unwilling to allege that Pratt knew about and acquiesced in the allegedly discriminatory removal and relocation of the poster. The passage says nothing whatsoever about the removal of the poster. As for the replacement of the poster in a less conspicuous spot, while the passage does say that the new location "was a compromise to those who were against any display of the poster," the passage does not reveal who these opponents were. Pratt might have been one of them. She might have insisted that the poster be re-hung, if at all, in a less noticeable spot. Or, faced with a dispute among her teachers, she might have brokered a compromise to that effect. In either event, if she knew about and acquiesced in the discriminatory treatment of the poster because of its religious theme, she could be held responsible.

If the Court seriously believes that the plaintiff will be unwilling on remand to make the necessary allegation, the Court could ask the plaintiff 's attorneys to proffer the amendment that they would make. The Court, however, has refused to take that step. The Court simply does not want to confront Zachary's First Amendment claim. Whatever the Court thinks about the validity or importance of that claim, however, it is entitled to be treated in accordance with the same procedural rules that we apply to the claims of other litigants.

19

III.

A. I will therefore address the issue that the en banc court evades: whether Zachary's constitutional right to freedom of expression was violated if, as the complaint alleges, his poster was given less favorable treatment than it would have received had its content been secular rather than religious.3

I would hold that discriminatory treatment of the poster because of its "religious theme" would violate the First Amendment. Specifically, I would hold that public school

_____

3. The issue here is not, as the District Court thought, whether Zachary had a "constitutional right to have the poster of Jesus displayed in any particular location" or to have it "displayed prominently" in the school. C.H. v. Oliva, 990 F.Supp. at 353, 355. The issue is whether he was entitled to nondiscriminatory treatment. Nor is the issue, as the panel suggested, whether the defendants were entitled to remove the poster for "a brief period of deliberation." C.H. v. Oliva, 195 F.3d at 175. Nowhere in the complaint -- or for that matter in the answer -- is it alleged that the poster was removed for this reason.

Nor, at this stage, is the question whether Zachary actually "suffered any compensable damages." Br. Amicus Curiae of the American Jewish Congress, Anti-Defamation League and Americans United for Separation of Church and State ("Amicus Br.") at 2. This case never progressed beyond the pleading stage. The complaint alleged that Zachary suffered emotional distress and anguish as a result of the defendants' actions, Complaint para. 27, and for now, that allegation is enough. Nor is the issue whether injunctive relief would be appropriate if a constitutional violation is ultimately found. See Amicus Br. at 4-5. At this stage it is sufficient that the complaint states a live claim for some form of relief --
and it clearly does.

Nor is the issue whether Pratt or Johnson is entitled to qualified immunity. Although this argument was asserted in the Medford defendants' supplemental appellate brief, it was not raised in the district
court in their motion for judgment on the pleadings, and it was not addressed by the district court. Under these circumstances, I would not reach the issue now. Moreover, even if we were to entertain the qualified immunity argument at this time, we would still be required, as the first step of our analysis, to decide whether the complaint stated a First Amendment claim. Siegert v. Gilley, 500 U.S. 226, 231 (1991); Harlow v. Fitzgerald, 457 U.S. 800, 102 (1982). And of course the qualified immunity defense would not apply to the school board in its official capacity. Owen v. City of Independence, 445 U.S. 622, 639-650 (1980).

20

students have the right to express religious views in class discussion or in assigned work, provided that their expression falls within the scope of the discussion or the assignment and provided that the school's restriction on expression does not satisfy strict scrutiny. This conclusion follows from the following two propositions: first, even in a "closed forum," governmental "viewpoint discrimination" must satisfy strict scrutiny and, second, disfavoring speech because of its religious nature is viewpoint discrimination.

B. Public schools are government property, and "the Government `no less than the private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " Cornelius v. NAACP Legal Defense and Education Fund, 473 U.S. 788, 800 ((1985) (quoting Greer v. Spock, 424 U.S. 828, 836 (1976)). The Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." Id. Consequently, government's ability to regulate speech on its own property often varies depending on the particular "forum" involved. In a "nonpublic forum," government may regulate expression much more extensively than in a "public forum," whether "traditional" or "dedicated." See, e.g., Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 954 (1983); Brody v. Sprang, 957 F.2d 1108, 1117 (3d Cir. 1992). Even in a nonpublic forum, however, where the greatest restrictions are permissible, "viewpoint discrimination" is not allowed unless it passes the highest scrutiny. See, e.g., Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 394–95 (1993); Cornelius, 473 U.S. at 800; Perry Education Ass'n, 460 U.S. at 46; Widmar v. Vincent, 454 U.S. 263 (1981); Brody, 957 F.2d at 1117.4 As Justice

_____

4. There is some support in Supreme Court opinions for the proposition that viewpoint-based restrictions are per se unconstitutional, see, e.g., City Council v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984), but other cases show that strict scrutiny applies. See, e.g., R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 392–94 (1992) (applying strict scrutiny to a regulation banning "fighting words"); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760–761 (1995) (plurality)

Brennan put it in Perry: "Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of `free speech.' " Perry Education Assn, 460 U.S. at 62 (Brennan, J., dissenting). Indeed, even when government is regulating a category of speech, such as "fighting words," that could be entirely prohibited, government may not discriminate based on viewpoint. R.A.V. v. City of St. Paul, 505 U.S. 377, 391-96 (1992).

C. The Supreme Court has made it clear that discrimination based on the religious character of speech is viewpoint discrimination. In Lamb's Chapel, the Court struck down a school district policy that permitted school facilities to be used after school hours by a wide variety of groups but prohibited the use of those facilities by a group that wished to show a film series addressing various child-rearing issues from a "Christian perspective." The Court held that "it discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject from a religious standpoint." 508 U.S. at 393-94. Likewise, in Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995), the Court examined university guidelines that refused to allow a student publication, "Wide Awake," to benefit from the "Student Activities Fund" because the publication reflected a religious perspective. It held that such guidelines violated the First Amendment because they discriminated against otherwise permissible speech on the basis of viewpoint. The Court wrote:

> It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought. The nature of our origins and destiny and

_____

(applying strict scrutiny to a restriction on religious advocacy); Texas v.
Johnson, 491 U.S. 397, 412 (1989) (applying strict scrutiny to a law barring flag desecration); See also Eugene Volokh, Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, 144 U. Pa. L. Rev. 2417, 2425 n.44 (1996).

their dependence upon the existence of a divine being have been subjects of philosophic inquiry throughout human history. We conclude, nonetheless, that here, as in Lamb's Chapel, viewpoint discrimination is the proper way to interpret the University's objections to Wide Awake.

515 U.S. at 831.

Accordingly, viewpoint discrimination is prohibited even in a nonpublic forum if strict scrutiny cannot be satisfied, and discrimination based on the religious content of speech is viewpoint discrimination. It follows that public school authorities may not discriminate against student speech based on its religious content if the discrimination cannot pass strict scrutiny.

D. Recognition of this important principle would not interfere with the operation of the public schools or impinge upon the rights of other students. Public school teachers have the authority to specify the subjects that students may discuss in class and the subjects of assignments that students are asked to complete. See, e.g. Cornelius, 473 U.S. at 806 (subject matter may be restricted in nonpublic forum); Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) (same); Brody, 957 F.2d at 1117 (same). Thus, if a student is asked to solve a problem in mathematics or to write an essay on a great American poet, the student clearly does not have a right to speak or write about the Bible instead.

Public school teachers may also enforce viewpoint-neutral rules concerning such matters as the length of an oral presentation or written assignment. See Brody , 957 F.2d at 1117 (reasonable time, place, and manner restrictions allowed in nonpublic forum). If a paper is limited to 20 pages, the school obviously may insist that all students, including any who wish to express a religious viewpoint, adhere to that rule.

In the public schools, low-value speech, such as vulgar and offensive language, may be restricted to a greater extent than would otherwise be permissible. As the Court observed in Bethel School District No. 403 v. Fraser, 478 U.S. 675, 683 (1986), "[s]urely it is a highly appropriate

23

function of public school education to prohibit the use of vulgar and offensive terms in public discourse."" `[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.' " Id. at 682 (citation omitted).

Finally, a public school may even restrict speech based on viewpoint if it can show a compelling interest for doing so. In Tinker, the Court stated: "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." 393 U.S. at 511. Later, the Court observed that "conduct by the student, in class or out of it, which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Id. at 513. Therefore, if the expression of a particular religious viewpoint, such as one espousing racial hatred, creates a sufficient threat, school authorities may intervene.

Taken together, these constitutionally permissible ways of regulating student speech provide ample means of ensuring that student expression does not interfere with the effective operation of the schools or cause harm to other students. School authorities are not permitted to discriminate against student expression simply because of its religious character.

E. When these principles are applied to the present case, it is clear that the judgment of the District Court must be reversed. Taking down Zachary's Thanksgiving poster and replacing it in a less conspicuous location because of its religious content was plainly viewpoint, not subject matter, discrimination. The subject matter of the poster was specified by Zachary's teacher: something for which he was thankful as the Thanksgiving holiday approached. His poster fell within the specified subject matter, and it is not alleged that the poster was subjected to discriminatory treatment because of that subject. Rather, the poster was allegedly given discriminatory treatment because of the viewpoint that it expressed, because it expressed thanks for Jesus, rather than for some secular thing. This was

24

quintessential viewpoint discrimination, and it was proscribed by the First Amendment unless the Medford defendants can show that allowing Zachary's poster to be displayed with his classmates' on a non-discriminatory basis would have "materially disrupt[ed] classwork or involve[d] substantial disorder or invasion of the rights of other[ ] [students]." Tinker , 393 U.S. at 513.

No such showing is evident from the pleadings, and nothing asserted in the Medford defendants' briefs suggests that they could make such a showing on remand. The Medford defendants contend that the treatment of Zachary's poster furthered the compelling interest of avoiding an Establishment Clause violation. See Medford Defendants' Supplemental Br. at 27-31. It is clear, however, that displaying Zachary's poster would not have violated the Establishment Clause. The Establishment Clause is not violated when the government treats religious speech and other speech equally and a reasonable observer would not view the government practice as endorsing religion. Capitol Square, 515 U.S. at 763-70 (1995)(plurality); id. at 777 (O'Connor, J., concurring in part and concurring in the judgment). See also Santa Fe Independent School District v. Doe, 120 S. Ct. 226, 2278 (2000).

Here, a reasonable observer would not have viewed the exhibition of Zachary's Thanksgiving poster along with the secular posters of his classmates as an effort by the school to endorse religion in general or Christianity in particular. An art display that includes works of religious art is not generally interpreted as an expression of religious belief by the entity responsible for the display. Even the amici supporting the defendants acknowledge that "[d]isplay of student artwork with religious themes is understood to be the personal expression of the student and not that of the school." Brief Amicus Curiae of the American Jewish Congress, Anti-Defamation League and Americans United for Separation of Church and State at 1. Furthermore, if there had been any danger that anyone might have reasonably interpreted the display of Zachary's poster in the hall as an effort by the school to endorse Christianity or religion, the school could have posted a sign explaining that the children themselves had decided what to draw. See

25

Capitol Square Review, 515 U.S. at 793-94 (Souter, J., concurring in the judgment).

For these reasons, I see no indication in the briefs that the Medford defendants had a compelling reason for treating Zachary's Poster in the manner alleged. Zachary's teacher in effect asked him a question: What are you thankful for as Thanksgiving approaches? Zachary was entitled to give what he thought was the best answer. He was entitled to be free from pressure to give an answer thought by the Medford educators to be suitable for a boy who is "public school material." Complaint para. 21.

F. In affirming the judgment of the district court, the panel took the position that a public school is free to practice viewpoint discrimination in regulating student speech in class and in assignments, provided only that the discrimination is "reasonably related to a legitimate pedagogical concern." 195 F.3d at 170-72. Moreover, the panel held that avoiding the possibility of "resentment" by parents is a legitimate pedagogical concern. Id . at 175. According to the panel, then, if public school authorities could reasonably think that a student's expression of a particular viewpoint in a class discussion or assignment could cause "resentment" on the part of other students or parents, the school may censor the student's speech.

The panel's view is radically at odds with fundamental First Amendment principles. As previously discussed, viewpoint discrimination strikes at the heart of the freedom of expression. And in order to restrict core First Amendment speech, much more is needed than the possibility that the speech may cause resentment. See Texas v. Johnson, 491 U.S. at 407-10. This principle applies to speech in public schools. As the Supreme Court wrote in Tinker, "[a]ny word spoken in class . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says that we must take this risk." Tinker, 393 U.S. at 737. Thus, "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the

26

discomfort and unpleasantness that always accompany an unpopular viewpoint." Id at 738.

The panel's understanding of the First Amendment principles applicable in this case was based on one case -- Hazelwood School District v. Kuhlmeir, 484 U.S. 260 (1988). See 195 F.3d at 171-74. The panel viewed Hazelwood as providing the governing standard for "student expression that is part of a school curriculum," see 195 F.3d at 171, including things that students say (or express by other means, such as artwork) when they are called upon by their teachers to express their own thoughts or views. This is an incorrect interpretation of Hazelwood. Hazelwood involved a high school principal's censorship of articles in the school newspaper. The Court described the issue before it as concerning "educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. The Court held that educators may regulate such activities "so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273. While Hazelwood certainly applies to many things that occur in the classroom -- such as work on the school newspaper at issue in that case (see 484 U.S. at 268) -- nothing in Hazelwood suggests that its standard applies when a student is called upon to express his or her personal views in class or in an assignment.

On the contrary, Hazelwood governs only those expressive activities that might reasonably be perceived "to bear the imprimatur of the school." 484 U.S. at 271. This understanding of Hazlewood is fortified by Rosenberger, where the Court wrote:

> A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles. See e.g., . . . Hazelwood School Dist. V. Kuhlmeier, 484 U.S. 260, 270-272.

515 U.S. at 834 (emphasis added).

27

Things that students express in class or in assignments when called upon to express their own views do not"bear the imprimatur of the school" Hazlewood, 484 U.S. at 271, and do not represent "the [school's] own speech." Rosenberger, 515 U.S. at 834. "The proposition that schools do not endorse everything that they fail to censor is not complicated." Westside Community Bd. v. Mergens, 496 U.S. 226, 250 (1990)(opinion of O'Connor, J.).

In the present case, for reasons already discussed, reasonable students, parents, and members of the public would not have perceived Zachary's poster as bearing the imprimatur of the school or as an expression of the school's own viewpoint. Thus, it is abundantly clear that Hazelwood has no application here.

If the panel's understanding of Hazelwood were correct, it would lead to disturbing results. Public school students -- including high school students, since Hazelwood was a high school case -- when called upon in class to express their views on important subjects, could be prevented from expressing any views that school officials could reasonably believe would cause "resentment" by other students or their parents. If this represented a correct interpretation of the First Amendment, the school officials in Tinker could have permitted students, as part of a class discussion, to express views in favor of, but not against, the war in Vietnam because some students plainly resented the expression of antiwar views. See 393 U.S. at 509 n.3. Today, school officials could permit students to express views on only one side of other currently controversial issues if the banned expression would cause resentment by some in the school, as it very likely would. Such a regime is antithetical to the First Amendment and the form of self-government that it was intended to foster.

IV.

In sum, I would hold that the District Court erred in granting judgment for the defendants. I would reverse and remand for a determination whether the Medford defendants did in fact treat Zachary's poster in a discriminatory fashion because of its religious content. And

28

if discriminatory treatment is shown, I would give the Medford defendants the opportunity to show that their actions were supported by a compelling reason and were narrowly tailored to serve that end.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit